**FILED**

JUN 23 2011

Clerk, U.S. District and

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| IN RE GRAND JURY SUBPOENA<br>NO. 10218019 |

No. _11- 362_

FILED UNDER SEAL
PURSUANT TO LCrR 6.1

## MOTION TO INTERVENE AND TO QUASH
## GRAND JURY SUBPOENA NO. 10218019

Pursuant to Rule 24 of the Federal Rules of Civil Procedure and Rules 6 and 17(c)(2) of

the Federal Rules of Criminal Procedure, the blogger who writes under the *nom de plume*

"Hannibal Lecter's Evil Twin" moves to intervene in the matter of a subpoena issued by a

federal grand jury sitting in the District of Columbia seeking documents related to his identity

and moves to quash that subpoena on the ground that the subpoena seeks material protected by

the First Amendment right to engage in anonymous political speech.

### BACKGROUND

On February 8, 2011, a federal grand jury sitting in the District of Columbia issued

Subpoena No. 10218019 to Automattic, Inc., a company that owns the popular blog-hosting

service WordPress.[1]  The subpoena demands "any records relating to the identity of the person(s)

that made a posting on http://hlet.wordpress.com/ who identified themselves as 'Hannibal

Lecter's Evil Twin' on 12/2/2010, at 3:23, time zone PST."  The subpoena indicates that

Automattic may comply "by promptly providing the requested documents by fax" to a United

---

[1] According to its website, more than 25 million people and organizations use WordPress to
power their home pages or blogs. *See* http://wordpress.org/.  (This and all other Internet sources
cited in this motion were last visited on June 22, 2011.)

States Capitol Police Special Agent. A copy of Subpoena No. 10218019 is attached to this motion as Exhibit A.

Automattic informed its customer – the author of the specified blog posting – of the subpoena, and indicated that it would not contest the subpoena, but would delay responding so that the author could seek legal counsel. The author contacted the American Civil Liberties Union, which concluded that the subpoena presented a threat to the important right of anonymous expression on the Internet, and therefore agreed to represent the author in seeking to quash the subpoena.

## FACTS

The Internet posting identified in Subpoena No. 10218019 is a derogatory screed about a United States Senator. But as will be seen below, the posting is a clear example of political speech that cannot justify the identification of an anonymous author through use of a grand jury subpoena.

The blogger whose identity is sought by Subpoena No. 10218019 is an individual who has been operating a blog since February 2009.[2] In the "About" section of the blog, the author describes it as a "rant blog," and wryly states, "Before I post anything here, I ask myself: How could I make this even more likely to disqualify me from ever running for any political office?"[3] A review of the blog reveals that the author uses it to vent about politics and current events, and occasionally about things that occur in the author's personal life. Posts have expressed the author's uninhibited views about politicians and other public figures, and have also commented on movies and television shows, health care policy, abortion rights, same-sex

---

[2] The blog can easily be located on the Internet by searching for "Hannibal Lecter's Evil Twin" using any search engine. The blog's archives go back to February 2009.

[3] http://hlet.wordpress.com/about/

marriage, Wikileaks, and "The Metaphysics of Gun Control."[4]

First among nineteen "Categories" of blog posts listed along the right-hand side of the blog's home page are four devoted to domestic politics: the "2012 Shit List," the "2014 Shit List," the "2016 Shit List," and "Confirmed Kills." Each of the "Shit Lists" names one or more U.S. Senators whose terms are expiring in the named year and who the author believes must be defeated. The category labeled "Confirmed Kills" names two former U.S. Senators whom the author had criticized and who were not re-elected in 2010.[5]

An examination of the blog shows that the author posted a series of rants about seven senators on December 2, 2010. Two days earlier, the Senate had defeated a proposed ban on "earmarks." The author was outraged that some Republican senators had voted against the ban, and posted scalding comments about them, placing each post in the "Shit List" corresponding to the year in which that senator is up for re-election. These posts declare – using vulgar and often crude metaphorical language – that the senator in question should not remain in office after his or her term expires.

For example, the post about Senator Lisa Murkowski states, "She can't be gotten rid of for 6 years, short of a tragic but welcome botox accident."[6] The post about Senator Richard Shelby says, "We'll shoot our own dog if it snarls at us once. Unfortunately, this Dick is safe till 2016. But if he thinks we'll forget by then, he's wrong."[7] And the post about Senator Richard

---

[4] http://hlet.wordpress.com/category/politics/

[5] George Voinovich of Ohio, who retired rather than seeking re-election, and Bob Bennett of Utah, who was defeated in the Republican primary election. Needless to say, both are alive and well.

[6] http://hlet.wordpress.com/category/2016-shit-list/

[7] *Id.*

Lugar says, "It's much more important to hang traitors on our side than to beat the other side."[8]

The full text of these seven postings is attached as Exhibit B.

The single blog entry targeted by Subpoena No. 10218019 is one of these seven postings.

The full post reads as follows:

### Thad Chochran – Republican Senator from Mississippi

Thad Cochran isn't up for rejection till 2014.  He's old as hell.
If we're lucky, he'll die before then from all the pork he's been consuming.

Citizens Against Government Waste rates him the top porker
in the Senate this year.  Yep, he beat out all Democrats.

He voted against the earmark ban, shocker.

He's a slimy political animal.  Let's put him down.[9]

Senator Cochran's term expires in 2014; this post about him was therefore placed on the "2014 Shit List."

Senator Cochran has been mentioned only one other time in the author's 28 months of blogging.  On November 18, 2010, the author again lambasted Republicans who did not support a ban on earmarks, listing several by name, and suggesting that "Sarah Palin should leave wolves alone and shoot Murkowski voters."[10]  Apparently the author couldn't think of Senator Cochran's name at that moment, and so referred to him as "some stupid southern Republican motherfucker from Mississippi or something whose name I'll remember eventually."[11]

---

[8] http://hlet.wordpress.com/category/2012-shit-list/

[9] http://hlet.wordpress.com/category/2014-shit-list/

[10] http://hlet.wordpress.com/2010/11/page/2/

[11] *Id.*

## ARGUMENT

### I.  The Author Has a Right to Intervene to Protect His or Her First Amendment Rights

It is well established in this Circuit that a person whose information is sought from a third

party has a right to intervene to protect his or her interest in non-disclosure.  Although the

Federal Rules of Criminal Procedure do not address intervention, "Federal courts have frequently

permitted third parties to assert their interests in preventing disclosure of material sought in

criminal proceedings." *United States v. Hubbard*, 650 F.2d 293, 311 n.67 (D.C. Cir. 1980)

(collecting cases).

Subsequent to *Hubbard*, this Court has at least twice granted motions to intervene to

challenge grand jury subpoenas.  In the first, a political committee moved to intervene when a

grand jury sought documents in the possession of its attorney.  This Court's order permitting

intervention is unreported, but the court of appeals noted that the motion was granted, *see In re

Sealed Case*, 46 F.3d 881, 883 (D.C. Cir. 1998), and held that the intervenor also had standing to

appeal this Court's order enforcing the subpoena – thus necessarily finding the intervention

proper. *Id.*

Similarly, in *In re Grand Jury Proceedings*, 201 F. Supp. 2d 5 (D.D.C. 1999), this Court

explained that

> Even though the grand jury subpoenas sought to be quashed are directed to the
> [law] firm and not to [the movant for intervention,] any asserted attorney-client
> privilege attaching to these documents would be held by [the movant] as the
> client. Where an individual's interest in protecting privileged materials from
> compelled disclosure is threatened, and it is clear that [the subpoena's addressee]
> will not risk a contempt citation in order to safeguard that interest, "a
> paradigmatic case of entitlement to intervention as of right" exists. *In re Katz*, 623
> F.2d 122, 124 (2d Cir. 1980). Therefore, the Court will grant [movant's] motion
> to intervene.

*Id.* at 9.

The D.C. Circuit discussed these principles at length in *In re Sealed Case*, 237 F.3d 657, 663-665 (D.C. Cir. 2001), where it held that the subject of a confidential Federal Election Commission (FEC) investigation had a right to intervene in the FEC's subpoena enforcement action against a third-party where the subject had a legally cognizable interest in maintaining the confidentiality of documents that the FEC sought to disclose. The Court noted the similarity between FEC investigations and grand jury proceedings, noting that both are entitled to a strong presumption of secrecy. *Id.* at 667. In allowing intervention, the Court emphasized the importance of allowing the real party in interest to seek to protect its rights. *See id.* at 664-665.

*In re Sealed Case* was a civil proceeding, and intervention rested on Federal Rule of Civil Procedure 24. Other courts have explicitly applied Rule 24(a) in the grand jury context, *see, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 570 (1st Cir. 2001); *In re Grand Jury Proceedings, PHE, Inc.*, 640 F. Supp 149, 151-52 (E.D.N.C. 1986) ("the grand jury proceeding is an 'action' in which intervention is allowed if the movant can demonstrate a sufficient interest"). And our Circuit has made it clear that the form of the motion is not dispositive: even if Rule 24 is not available, third parties can "bring a simple motion to preserve their rights as contemplated in *United States v. Hubbard*, 650 F.2d 293 (1980)." *In re Sealed Case*, 237 F.3d at 664.

Additionally, this Court has supervisory power over the grand jury, *see United States v. Calandra*, 414 U.S. 338, 346 n.4 (1974) ("The grand jury is subject to the court's supervision in several respects. In particular, the grand jury must rely on the court to compel production of books, papers, documents, and the testimony of witnesses, and the court may quash or modify a subpoena on motion if compliance would be unreasonable or oppressive.") (internal quotation and citations omitted), and thus has inherent authority to allow a third party to intervene if the information sought by a subpoena impinges on the third party's legitimate interest. *See In re*

*Grand Jury Proceedings*, 814 F.2d 61, 66-67 (1st Cir. 1987); *In re Grand Jury (Schmidt)*, 619

F.2d 1022, 1026-27 (3d Cir.1980).  *See also Gravel v. United States*, 408 U.S. 606, 608-09

(1972) (noting that the district court had granted Senator Gravel's motion to intervene in grand

jury proceedings to seek to quash a subpoena directed to one of his aides).

Numerous courts have joined this Court in holding that third parties have standing to

move to quash a grand jury subpoena in order to protect their First Amendment rights.  *See In re*

*First National Bank, Englewood, Colo.*, 701 F.2d 115, 117-118 (10th Cir. 1983) (anti-tax

organization had standing to challenge grand jury subpoena directing its bank to produce its

records based on claims that the subpoena chilled its rights under the First Amendment); *Int'l*

*Longshoreman's Ass'n v. Waterfront Commission*, 667 F.2d 267, 270-72 (2d Cir. 1981) (union

had standing to move to enjoin enforcement of subpoena issued to third party to protect its

members' First Amendment rights); *United States v. Citizens State Bank*, 612 F.2d 1091, 1094

(8th Cir. 1980) (advocacy organization had right to intervene in action to enforce IRS subpoena

on ground that production of documents would violate its First Amendment rights).

As shown below, the author has an important First Amendment interest in speaking

anonymously on the Internet that will not be protected unless he or she is allowed to intervene.

Intervention should therefore be granted.

## II.  The Subpoena Should be Quashed Because it Seeks to Infringe the Author's First Amendment Right of Anonymous Political Advocacy

### A. The First Amendment Limits the Investigative Powers of the Grand Jury

Although the grand jury is entitled to a wide range of information in performing its

function of determining whether there is probable cause to believe that a crime has been

committed, its "power is not unlimited." *United States v. Calandra*, 414 U.S. at 346.  In

particular, a grand jury's investigative powers  "are constrained by any valid privilege, whether

established by the Constitution, statute, or the common law." *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, 706 F. Supp. 2d 11, 13 (D.D.C. 2009).

The First Amendment privilege is one of the privileges constraining the power of the grand jury, and prosecutors must operate within its bounds. *See, e.g., Branzburg v. Hayes*, 408 U.S. 665, 708 (1972) ("Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth."); *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1992) ("No governmental door can be closed against the [First] Amendment. No governmental activity is immune from its force. That the setting for the competition between rights secured by the First Amendment and antagonistic governmental interests is a grand jury proceeding is simply one of the factors that must be taken into account in striking the appropriate constitutional balance.").

Thus, this Court has determined that "[i]n order to survive a First Amendment challenge" to a grand jury subpoena *duces tecum*, "the government must show that they have a compelling interest in the sought-after material and that there is a sufficient nexus between the subject matter of the investigation and the information they seek." *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009); *In re Grand Jury Subpoena to Kramerbooks & Afterwards, Inc.*, Nos. 98-MC-135-NHJ, 98-138-NHJ, 26 Med. L. Rptr. 1599, 1600 (D.D.C. Apr. 6, 1998). The federal circuits that have addressed this issue have applied the same standard. *See In re Grand Jury Subpoenas Duces Tecum*, 78 F.3d 1307, 1312 (8th Cir. 1996) (government must "demonstrate a compelling interest in and a sufficient nexus between the information sought and the subject matter of its investigation"); *National Commodity and Barter Ass'n v. United States*, 951 F.2d 1172, 1174 (10th Cir. 1991)

8

("government must show a compelling need to obtain the documents . . . [and] that the records

sought bear a substantial relationship to this compelling interest"); *In re Grand Jury Proceeding*,

842 F.2d 1229, 1233 (11th Cir. 1988) (government must "'convincingly show a substantial

relation between the information sought and a subject of overriding and compelling state

interest'") (quoting *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 546

(1963)); *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102-03 (2d Cir. 1985) ("the interests of

the state must be 'compelling,'" and "there must be some 'substantial relation' between the

governmental interest and the information required to be disclosed") (citations omitted); *Bursey

v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972) (government must establish that its

"interest in the subject matter of the investigation is 'immediate, substantial, and subordinating'

[and] that is a 'substantial connection' between the information it seeks to have the witness

compelled to supply and the overriding governmental interest in the subject matter of the

investigation") (quoting *Gibson v. Florida Legislative Investigation Comm.*, *supra*) (*overruled in

part on other grounds by In re Grand Jury Proceedings*, 863 F.2d 667, 670 (9th Cir. 1998)).  A

subpoena for material protected by the First Amendment that cannot meet this standard is

necessarily "unreasonable or oppressive" under Fed. R. Crim. P. 17(c)(2), and therefore should

be quashed.[12]

---

[12] The only circuit that has articulated a different standard is the Fourth, which stated in *In re
Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229 (4th Cir. 1992), that a court should
"balance the government's need for documents against the possible constitutional infringement
. . . without placing any special burden on the government." *Id.* at 234.  This court rejected that
standard in *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, 706 F.
Supp. 2d at 18-19, noting that the Fourth Circuit's "reading of Supreme Court precedent is
incorrect . . . because neither case [relied upon by the Fourth Circuit] held a First Amendment
right was implicated by the subpoenas being reviewed, and as such neither court considered
whether the substantial relationship would be the appropriate standard of review for a subpoena
implicating First Amendment interests." *Id.* at 19.

As discussed below, the identity of an anonymous Internet speaker is strongly protected by the First Amendment. A subpoena seeking the author's identity must therefore be quashed unless the government can demonstrate that the grand jury has a compelling interest in obtaining the author's identity and that there is a sufficient nexus between the author's identity and a legitimate investigation into possible criminal activity. Neither showing can be made here.

### B. The First Amendment Protects the Right to Speak Anonymously

Robust protection for the right to engage in anonymous communication – to speak, read, view, listen, and/or associate anonymously – is fundamental to a free society. As the Supreme Court explained in *Talley v. California*, 362 U.S. 60 (1960):

> Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. . . . Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. ... Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.

*Id.* at 64-65. The Court has repeatedly reaffirmed the importance of the right to speak anonymously. *See, e.g., Watchtower Bible & Tract Society of New York v. Village of Stratton*, 536 U.S. 150, 166-168 (2002) (striking down ordinance requiring identification for door to door canvassing; noting that "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely be a desire to preserve as much of one's privacy as possible" (internal quotation marks and citation omitted)); *McIntyre v. Ohio Elections Commission* 514 U.S. 334 (1995) (striking down state law prohibiting distribution of anonymous campaign literature; observing that "[a]nonymity is a shield from the tyranny of the majority," that "exemplifies the purpose" of the First Amendment

"to protect unpopular individuals from retaliation . . . at the hand of an intolerant society." *Id.* at

357); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999) (striking

down requirement that petition circulators wear nametags).

The Supreme Court has been equally protective in cases presenting the closely related

issue of disclosure of a person's identity as a member of an organization that exercises First

Amendment rights.  Thus, in *NAACP v. Alabama*, 357 U.S. 449 (1958), the Court held that the

First Amendment protected the identity of the NAACP's members from compelled disclosure

under a state court order, noting that "compelled disclosure of affiliation . . . may constitute [an]

effective . . . restraint on freedom of association." *Id.* at 462.  In *Brown v. Socialist Workers '74*

*Campaign Committee (Ohio)*, 459 U.S. 87 (1982) (sustaining an as-applied challenge to

campaign finance reporting requirements), the Supreme Court echoed this Court's standard for

First Amendment challenges to grand jury subpoenas: "The right to privacy in one's political

associations and beliefs will yield only to a 'subordinating interest of the State that is

compelling,' and then only if there is a 'substantial relation between the information sought and

[an] overriding and compelling state interest.'" *Id.* at 91 (citations omitted).  *Accord NAACP v.*

*Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982) ("forced disclosure of one's political

associations is, at least in the absence of a compelling state interest, inconsistent with the First

Amendment's guaranty of associational privacy"); *Baird v. State Bar of Arizona*, 401 U.S. 1, 6

(1971) ("when a State attempts to make inquiries about a person's beliefs or associations, its

power is limited by the First Amendment.  Broad and sweeping state inquiries into these

protected areas . . . discourage citizens from exercising rights protected by the Constitution.")

(plurality opinion).

The First Amendment's protection of anonymous speech emphatically extends to speech on the Internet, which has largely taken over the role of pamphlets, leaflets and soapboxes as the means by which ordinary people can communicate their views to the public. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) (there is "no basis for qualifying the level of First amendment protection applied to" the Internet); *USA Technologies, Inc. v. John Doe, A.K.A. "Stokklerk"* 713 F. Supp. 2d 901, 906 (N.D. Cal. 2010) (recognizing the "Constitutional protection afforded pseudonymous speech over the internet"); *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) ("The right to speak anonymously extends to speech via the Internet. Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas."); *Columbia Ins. Co. v. Seescandy.Com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999) (the "ability to speak one's mind" on the Internet "without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate."); *Solers, Inc. v. Doe*, 977 A.2d 941, 951 (D.C. 2009) ("'Anonymous internet speech in blogs or chat rooms in some instances can become the modern equivalent of political pamphleteering[,]' which the Supreme Court has noted '"is . . . an honorable tradition of advocacy and of dissent."'") (quoting *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005)) (in turn quoting *McIntyre*, 514 U.S. at 357) (brackets in original).

### C. The Grand Jury Has No Compelling Interest in Obtaining This Author's Identity

As this Court has recognized, expressive material is presumptively entitled to First Amendment protection. *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, 706 F. Supp. 2d at 17; *Boggs v. Merletti*, 987 F. Supp. 1, 6 n.2 (D.D.C. 1997) ("Boggs Bills" – illustrations of United States currency – are presumptively protected by the First Amendment). *See also Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989); *In re Subpoena Duces Tecum*, 829 F.2d 1291, 1296 n.5 (4th Cir. 1987). There can be no doubt that

the blog post involved here, condemning elected officials for their votes on proposed legislation, is entitled to that presumption, for "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

Protected speech on public issues or about public officials need not be articulate or polite. Indeed, "it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941) (footnote omitted).[13] Crude and fiery political speech must be examined against the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Where the law seeks to punish political speech, courts must be especially vigilant, so that "public debate will not suffer for lack of [the] 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

Thus, as in *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, to overcome the presumption of constitutionality and pierce the speaker's right of anonymity, the government must show that the speech it wishes to investigate is not protected by the First Amendment. 706 F. Supp. 2d at 17. It cannot make that showing here.

The government may argue that the statement "Let's put him down," in the blog post

---

[13] In the omitted footnote, the Court quoted Thomas Jefferson's description of "the putrid state into which our newspapers have passed, and the malignancy, the vulgarity, and mendacious spirit of those who write them." 314 U.S at 270 n.16. Mr. Jefferson might have characterized the blog involved in this case in much the same way. Jefferson continued, however, to say that such newspapers are "an evil for which there is no remedy, our liberty depends on the freedom of the press, and that cannot be limited without being lost." *Id.*

identified by the subpoena, constitutes, or may constitute, a threat to Senator Cochran.[14]
Assuming that is the government's theory, it should be rejected. This court can and should rule,
as a matter of law, that the author's blog post did not cross the line from caustic political speech
to a "true threat" that may be subjected to criminal punishment.

### 1. The True Threat Doctrine

The government can criminalize speech only "in a few limited areas," *United States v.
Stevens*, 130 S. Ct. 1577, 1584 (2010), including speech that constitutes a true threat: "True
threats encompass those statements where the speaker means to communicate a serious
expression of an intent to commit an act of unlawful violence to a particular individual or group
of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003).

While our Circuit has not addressed the true threat doctrine in more than forty years,
there is consensus among the other circuits that a communication is not a true threat unless a
reasonable person would view it as expressing a serious intention to cause harm. *See, e.g.,
United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) ("Statements constitute a true threat if
an ordinary reasonable recipient who is familiar with their context would interpret those
statements as a threat of injury.") (quotation marks and citations omitted); *United States v.
Kosma*, 951 F.2d 549, 557 (3d Cir. 1991) (defining "threat" as "'a serious expression of an
intention to inflict bodily harm'") (quoting *Roy v. United States*, 416 F.2d 874, 877-78 (9th Cir.
1969)); *accord United States v. Fulmer*, 108 F.3d 1486, 1490-91 (1st Cir. 1997); *United States v.
Alkhabaz*, 104 F.3d 1492, 1495 (6th Cir. 1997); *United States v. Malik*, 16 F.3d 45, 51 (2nd Cir.
1994); *United States v. Manning*, 923 F.2d 83, 85-86 (8th Cir. 1991); *United States v. Khorrami*,

---

[14] The subpoena indicates on its face that the grand jury is investigating a possible violation of
18 U.S.C. § 115, which criminalizes threats to assault or murder federal officials while engaged
in the performance of official duties, or with intent to retaliate against them on account of the
performance of official duties.

895 F.2d 1186, 1192 (7th Cir. 1990); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir.

1983); *United States v. Rogers*, 488 F.2d 512, 514 (5th Cir. 1974); *United States v. Hart*, 457

F.2d 1087, 1090-91 (10th Cir. 1972). This is an objective test; it does not require interrogation

or investigation of the speaker, as the leading Supreme Court case makes clear.[15]

In *Watts v. United States*, 394 U.S. 705 (1969), this Court convicted Robert Watts of

threatening the President when, after receiving his 1-A draft classification, he told a crowd of

anti-war demonstrators gathered at the Washington Monument, "If they ever make me carry a

rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. The court of appeals affirmed

the conviction over Judge Skelly Wright's dissent, 402 F.2d 676 (D.C. Cir. 1968), but the

Supreme Court reversed, holding that this Court had erred in denying a motion for acquittal

made by the defendant at the close of the government's case. *Id.* The Court held, as a matter of

law, that "the kind of political hyperbole engaged in by petitioner" could not be considered a true

threat. *Id.* at 708. "We agree with petitioner that his only offense here was 'a kind of very crude

offensive method of stating a political opposition to the President.' Taken in context . . . we do

not see how it could be interpreted otherwise." *Id.*

*Watts* made clear that a conviction could not be based on an isolated word or phrase but

required an examination of the speaker's communication as a whole, including its context. *Id.*;

*accord Virginia v. Black*, 538 U.S. at 367 ("The prima facie evidence provision in this case

ignores all of the contextual factors that are necessary to decide whether a particular cross

---

[15] A number of the cases cited in the text, and others, have specifically applied the "true
threat" standard to cases arising under 18 U.S.C. § 115 and similar federal statutes. *See Kosma,
Roy, Manning, Rogers, Hart, Callahan, Malik,* and *Khorrami, supra; see also United States v.
Hoffman,* 806 F.2d 703, 706-707 (7th Cir. 1986); *United States v. Davilla,* 461 F.3d 298, 304-05
(2d Cir. 2006); *United States v. Roberts,* 915 F.2d 889, 890 (4th Cir. 1990); Martin v. *United
States,* 691 F.2d 1235, 1240 (8th Cir. 1982); *United States v. Alaboud,* 347 F.3d 1293, 1296-97
(11th Cir. 2003).

burning is intended to intimidate. The First Amendment does not permit such a shortcut.");

*United States v. Morales* 272 F.3d 284 (5th Cir. 2001), *cert. denied*, 536 U.S. 941 (2002)

(communication is a true threat only if "in its context [it] would have a reasonable tendency to

create apprehension that its originator will act according to its tenor."); *United States v. Malik*, 16

F.3d 45, 49 (2d Cir. 1994) ("'[w]ritten words or phrases take their character as threatening or

harmless from the context in which they are used, measured by the common experience of the

society in which they are published'") (quoting *United States v. Prochaska*, 222 F.2d 1, 2 (7th

Cir. 1955) (alteration by the *Malik* court).[16]

Courts have consistently rejected efforts to treat a statement as a true threat when its

language does not take the form of a threat and its context does not make clear that the language

conveys a real threat. *See, e.g., New York ex rel. Spitzer v. Operation Rescue National*, 273 F.3d

184, 196-197 (2d Cir. 2001) (statement that "killing babies is no different than killing doctors,"

made to an abortion doctor soon after the murder of another doctor at her clinic, was not a threat

but a statement of a political opinion); *United States v. Landham*, 251 F.3d 1072, 1083-1084 (6th

Cir. 2001) (messages left for ex-wife by ex-husband calling her offensive names and saying

---

[16] A few months after *Watts*, the D.C. Circuit held that "merely idle talk or jests" could no longer be criminalized as a true threat. *Alexander v. United States*, 418 F.2d 1203, 1205-06 (D.C. Cir. 1969). That was our Circuit's last case involving the "true threat" doctrine. In *United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999), the court of appeals held that 47 U.S.C. § 223(a)(1)(C), which criminalizes making a telephone call without disclosing one's identity and "with intent to annoy, abuse, threaten, or harass any person at the called number" violated the First Amendment as applied to calls made to a federal official calling him a "whore" and a "criminal with cold blood," and accusing him of "mak[ing] a violent crime against me, violating the rights in court of the white people." *Id.* at 673-74. In *United States v. Syring*, 522 F. Supp. 2d 125 (D.D.C. 2007), Judge Kollar-Kotelly denied a motion to dismiss an indictment for making threats, holding that the facts alleged in the indictment presented a jury question as to whether the harassing telephone calls at issue included true threats. The defendant then accepted a plea bargain and the case never went to trial. *See United States v. Syring*, No. 07-cr-204, Doc. 45 (terms of plea bargain).

"You're going to lose Rachel Gail as well as Priscilla. You better talk to me now. . . . They're going to take them away from you and they're going to convict you so you just watch out" were protected speech; context made clear father was referencing a custody battle, and not threatening to kidnap the kids); *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008) (slogans stating "I AM A FUCKING SUICIDE BOMBER COMMUNIST TERRORIST," "PULL ME OVER! PLEASE, I DARE YA," and "ALLAH PRAISE THE PATRIOT ACT . . . FUCKING JIHAD ON THE FIRST AMENDMENT! P.S. W.O.M.D. ON BOARD!" painted on a van are protected speech that a reasonable observer would see as "an obviously satiric or hyperbolic political message.")

In a particularly instructive case, the Ninth Circuit held that a college professor's statement that "I, for one, have etched the name of . . . and others of her ilk on my permanent shit list, a two-ton slate of polished granite which I hope to someday drop in [*sic*] [the new college president's] head," was protected speech. *Bauer v. Sampson* 261 F.3d 775, 780 (9th Cir. 2001). The professor also wrote a fantasy description of the funeral of one of the school's trustees at which the other trustees and the university president died of asphyxiation, and included cartoons depicting beheadings and a man pointing a rifle. *Id.* The court stated, "We agree with the district court's holding that although Bauer's writings have some violent content, they 'are hyperbole of the sort found in non-mainstream political invective and in context . . . are patently *not* true threats.' Under the reasonable speaker test, these writings would not be perceived as 'true threats.' They were made in an underground campus newspaper in the broader context of especially contentious campus politics." *Id.* at 783-784 (emphasis and ellipsis in original).

By contrast, most cases where courts have allowed criminal prosecutions (or civil suits) for threatening statements involve explicit statements of intent to do physical harm, where the statements are directed to the intended victims, and where the context confirms the intention.

17

*See, e.g., United States v. Wolff*, 370 Fed. Appx. 888, 891 (10th Cir. 2010) ("this will be a standoff at the property in question, and which I will give my life if need be, but which I will take any that will try to come against me" mailed to 240 individuals including a judge and an IRS agent); *United States v. Sutcliffe*, 505 F.3d 944, 951 (9th Cir. 2007) ("If I ever see you near my family again, and I know how to stalk too, I will kill you. That's my offer."); *United States v. Santos*, 131 F.3d 16, 18 (1st Cir. 1997) (defendant wrote to the President, "you have upset me to the point that I feel I should assassinate you which would enable me to go down in the history books and if the Secret Service gets in my way they will get it too"); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997) (telephone calls to Allstate agents saying "Allstate had better stop messing with me or else I'm going to blow up their building"); *United States v. Dinwiddie*, 76 F.3d 913, 917 (8th Cir. 1996) ("Patty, you have not seen violence yet until you see what we do to you"); *United States v. Malik*, 16 F.3d at 48 ("What the Court is telling the Plaintiff in his eyes is to deal with each of these defendants family and them physically upon his soon prison discharge"); *United States v. Kosma*, 951 F.2d at 550 ("21 guns are going to put bullets through your heart & brains"); *United States v. Orozco-Santillan*, 903 F.2d 1262, 1264 (9th Cir. 1990) ("You're going to get your ass kicked, punk"); *United States v. Hoffman*, 806 F.2d 703, 704 (7th Cir. 1986) ("Resign or You'll Get Your Brains Blown Out.").

But even facially threatening statements directed at specific individuals are protected speech if the context shows them to be political hyperbole rather than true threats. Thus, in *Claiborne Hardware*, the Supreme Court held that the statement "If we catch any of you going in any of them racist stores, we're gonna break your damn neck," 458 U.S. at 902, delivered to a rally of several hundred people, was protected by the First Amendment. The Court acknowledged that strong language was used but noted that the rest of the speech called for

18

respect and unification, and observed, "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." *Id.* at 928.

Like Internet postings, rap music often contains "violent imagery" and metaphor. *Latour v. Riverside Beaver School Dist.*, 2005 WL 2106562 at *2 (W.D. Pa. 2005). It is therefore instructive that in a case involving rap music that was "published on the internet," *Id.*, the court found that that violent metaphors about killing people were not true threats but "just rhymes," or, as one witness put it, reflected the composer "flexing [his] lyrical muscle." *Id.*

In another instructive case, *J.S. ex rel. H.S. v. Bethlehem Area School Dist.*, 807 A.2d 847 (Pa. 2002), the Pennsylvania Supreme Court considered material on a student's website that asked readers to state why a particular teacher should die, showed a picture of the teacher's head severed from her body, and solicited funds to hire a hit man. The court noted that "the statements regarding solicitation of a hitman and the questions as to why Mrs. Fulmer should die were stated unconditionally and unequivocally." *Id.* at 859. Nevertheless, the court concluded that "the web site, taken as a whole, was a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody. However, it did not reflect a serious expression of intent to inflict harm." *Id* at 658.

### 2. There Was No True Threat Here

As noted above, subpoena No. 10218019 seeks the identity of the person who posted the following comment on the Internet:

**Thad Chochran – Republican Senator from Mississippi**

Thad Cochran isn't up for rejection till 2014. He's old as hell.
If we're lucky, he'll die before then from all the pork he's been consuming.

Citizens Against Government Waste rates him the top porker
in the Senate this year. Yep, he beat out all Democrats.

He voted against the earmark ban, shocker.

He's a slimy political animal. Let's put him down.

The phrase "Let's put him down" is the only part of this post that possibly could have attracted the grand jury's attention. But read in context – in the context of this post, in the context of the seven posts about seven Senators posted that same day, and in the context of this blog as a whole, and in the context of how people express themselves on blogs – this phrase is a call to defeat Senator Cochran politically, not to do him physical harm, and a reasonable person could not think otherwise.

The phrase "put down," or "put him down," has many meanings. The Merriam-Webster online dictionary gives eight separate meanings, including to "depose" or to "humiliate" or "squelch." *See* http://www.merriam-webster.com/dictionary/put%20down. One of those meanings is "to do away with (as an injured, sick, or aged animal)," and the blog post's preceding sentence, "He's a slimy political animal," may put some readers in mind of that usage. But the word "political" makes clear that the reference is not literal but metaphorical: the way to put an animal down is with a needle; the way to put a "political animal" down is with an election.

The context of the seven December 2, 2010 posts makes it unmistakably clear that the author intended "Let's put him down" to mean "Let's defeat Sen. Chochran in the 2014 election." The post began by saying "Thad Cockroach isn't up for rejection till 2014," and was placed in the blog category "2014 Shit List." Other Republican Senators who voted against earmark reform were mentioned in separate posts and also put in blog categories based on the year that they were coming up for re-election. Each of the entries plainly refers to the author's desire to see the subject defeated politically:[17]

• Regarding Senator Murkowski, the blogger says, "She can't be gotten rid of for 6 years, short of a tragic but welcome botox accident." That can only refer to defeat at the polls

---

[17] As noted earlier, the full texts of the seven blog entries are set out in Exhibit B.

when her term expires in six years, if "gotten rid of" had any non-electoral meaning, it would not be necessary to wait six years.

 &bull; The blog post regarding Senator Imhofe says, "We need to Old Yeller him," and explains that "Imhofe is up for rejection in 2012. Right now, there's nobody I can think of that it's more important to beat." In the movie *Old Yeller*, the dog of that name has to be "put down" because he has rabies. But the blog post obviously uses the phrase metaphorically, referring to the 2012 election. Any other meaning would render meaningless the phrase, "nobody . . . more important *to beat*."

 &bull; The entry for Senator Lugar says, "It's much more important to hang traitors on our side than to beat the other side." But the author is not suggesting hanging Senator Lugar with a rope; he explains: "He's up for election in 2012. I'll give money to a Democrat to defeat him. And so should you."

 &bull; Regarding Senator Shelby, the blogger says, "These assholes need to get the message. We'll shoot our own dog if it snarls at us once." And again the author explains: "Unfortunately, this Dick is safe till 2016  But if he thinks we'll forget by then, he's wrong." The meaning is clear: we'll "shoot our own dog," *i.e.*, we'll unseat this member of our own party, when he's up for re-election in 2016. As with the post on Senator Murkowski, there is no other possible meaning to "this Dick is safe till 2016."

 &bull; The post for then-Senator Bennett says he has already been "torched by Mike Lee," meaning that he has already been defeated in the Republican Party primary, not burned with fire.[18] Continuing with the metaphor of Senator Bennett having been cooked, the blogger says

---

[18] The website of the Utah Republican Party, online at http://blog.utgop.org/sites/2010/05/senate-race-1st-round-results/, shows that Mr. Lee received 982 votes in the 2010 primary, compared to Senator Bennett's 885.

"Put a fork in Bennett, because he needs to have forks stuck into him." Obviously the author was not suggesting that readers go up to Senator Bennett and stick him with a kitchen implement.[19] The blog post says that if Bennett "tries to rise from the dead, let's not forget his parting shot." Obviously Senator Bennett was (and is) not "dead," except metaphorically, referring to his political career. Notably, the post about former Senator Bennett is indexed under "Confirmed Kills" on the blog's home page – presumably where the author hopes to move the posts about the other Senators who voted against earmark reform as they are "killed" in 2012, 2014, and 2016.[20]

• Finally, there is a short, three-sentence post on then-Senator Voinovich, urging Ohio to "keep a sharp eye on this Republican turdblossom." Senator Voinovich retired at the end of 2010 rather than seeking re-election,[21] so there was no need for the blogger to urge his defeat in strong language. This post was also classified under "Confirmed Kills" on the blog's home page, although Mr. Voinovich remains alive and well.

Any reasonable person reading these posts would understand that the author was not being literal when he used terms such as "hang," "torch," "shoot our own dog," "put a fork in," "Old Yeller," "put down," and "dead," but was employing vivid political metaphors. This type

---

[19] To "stick a fork in" someone or something is a phrase "used to indicate a losing cause. . . . When a sports team, for example, is losing, and then losing badly so defeat seems inevitable, a commentator might say 'stick a fork in them.'" The Phrase Finder, online at http://www.phrases. org.uk/bulletin_board/54/messages/228.html. *See also, e.g.,* Timothy Williams, "Stick a Fork in Harlem Soul Food? It Seems Done." N.Y. Times, Nov. 12, 2008, online at http://cityroom.blogs. nytimes.com/2008/11/12/stick-a-fork-in-harlem-soul-food-it-seems-done/.

[20] Rep. John Boehner, now Speaker of the House, employed the same usage during the 2010 campaign, saying that a Democratic candidate in Ohio "may be a dead man. He can't go home to the west side of Cincinnati." Alex Isenstadt, *Campaigns equate guns, strength,* POLITICO, Jan. 11, 2011, online at http://www.politico.com/news/stories/0111/47397.html.

[21] *See United States Senate election in Ohio, 2010,* online at http://en.wikipedia.org/wiki/United _States_Senate_election_in_Ohio_2010#cite_note-retire-1. The blog post misspells the senator's name as "Voinovitch," an error that has not been corrected in Exhibit B.

of writing is not only typical of this particular blog, but is characteristic of many blogs and many Internet postings by readers responding to news articles. *See, e.g.,* Clark Hoyt, *Civil Discourse, Meet the Internet,* N.Y. Times, November 4, 2007, online at http://www.nytimes.com/2007/11/ 04/ opinion/04pubed.html.[22] As our Circuit has observed in a related context, "it is in part the *settings* of the speech in question that makes their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them." *Moldea v. New York Times Co.,* 22 F.3d 310, 314 (D.C. Cir.) (noting that readers of a book review understand that it contains subjective evaluations), *cert. denied,* 513 U.S. 875 (1994).

The Internet allows people to vent their feelings, just as journals or handbills once did, and it is unsurprising that a "rant blog" contains exaggerated language and highly critical thoughts. If the definition of true threats were expanded to include political hyperbole like that found in this blog, the government would have cause to prosecute thousands of people every day, including perhaps some of our elected officials themselves.[23]

---

[22] A similar style is also regularly employed in sports commentary, where one team is reported to have "killed," "murdered," "wiped out," "massacred," "slaughtered," "crushed," or "stomped on" an opposing team, not to mention having simply "beaten" them. All readers or listeners understand that the terms are used metaphorically. It is not surprising that the same usages have migrated to the "sport" of politics.

[23] The "widespread, casual use of violent and militaristic language and themes on the campaign trail" was widely noted during the 2010 campaign. Alex Isenstadt, *Campaigns equate guns, strength,* POLITICO, Jan. 11, 2011, online at http://www.politico.com/news/stories/0111/47397. html.

For example, Sarah Palin posted a map on her Facebook page showing the districts of Representatives she wanted to defeat with gunsight-type crosshairs superimposed on them. *See* John Beerman, *Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate,* ABC News, Jan. 9, 2011, online at http://abcnews.go.com/Politics/sarah-palins-crosshairs-ad-focus-gabrielle-giffords-debate/story?id=12576437&page=1. The map remains on Ms. Palin's Facebook page as of June 22, 2011, online at http://www.facebook.com/notes/sarah-palin/dont-get-demoralized-get-organized-take-back-the-20/373854973434.

Republican congressional candidate Brad Goehring proclaimed on his campaign Facebook page, "If I could issue hunting permits, I would officially declare today opening day for liberals.

Whether it is positive or negative for our society that people engaged in political commentary use illustrations of gunsights or hot-headed metaphors such as "torch," "hang," "Old Yaller," "put a fork in," and "put down," is beside the point. We may all wish that such illustrations or such language were not used, but the First Amendment protects such forms of expression and does not allow the government to use grand jury subpoenas to unmask the identity of anonymous political speakers just because they speak in such a style.

## CONCLUSION

Because the blog entry that triggered grand jury subpoena no. 10218019 is unambiguous political speech and cannot plausibly be viewed as a threat, the author's identity is protected by the First Amendment privilege for anonymous speech. Because the government cannot demonstrate that it has a compelling interest in overcoming that privilege, as required by this

---

The season would extend to November 2 and have no limits on how many taken, as we desperately need to 'thin' the herd." *Republican candidate in Facebook flap*, online at http://www.upi.com/Top_News/US/2010/05/12/Republican-candidate-in-Facebook-flap/UPI-17941273702759/.

Representative Michelle Bachmann said, "I want people in Minnesota armed and dangerous on this issue of the energy tax because we need to fight back. Thomas Jefferson told us 'having a revolution every now and then is a good thing,' and the people – we the people – are going to have to fight back hard if we're not going to lose our country." Kate Galbraith, *Michele Bachmann Seeks 'Armed and Dangerous' Opposition to Cap-and-Trade*, N.Y. Times, March 25, 2009, online at http://green.blogs.nytimes.com/2009/03/25/michele-bachmann-seeks-armed-and-dangerous-opposition-to-cap-and-trade/.

Tea Party-affiliated congressional candidate Rick Barber ran a television ad in which a person dressed as George Washington listened to an attack on the Obama agenda and proclaimed, "Gather your armies." Matt Bai, *A Turning Point in the Discourse, but in Which Direction?*, N.Y. Times, Jan. 8, 2011, online at http://www. nytimes.com/2011/01/09/us/politics/09bai.html.

And in his successful 2010 congressional campaign, Rep. Allen West (R-Florida) urged supporters "to get your musket, to fix your bayonet, to charge into the ranks" and "fight with me to take back America!" Dan Eggen and W.T. Farnam, *Michele Bachmann, others raise millions for political campaigns with 'money blurts,'* Washington Post, June 29, 2011, online at http://www.washingtonpost.com/politics/michele-bachmann-others-raise-millions-for-political-campaigns-with-money-blurts/2011/06/16/AGROkubH_story.html.

These are just five examples out of many.

24

Court's ruling in *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, the subpoena is "unreasonable or oppressive" under Fed. R. Crim. P. 17(c)(2). The motion to intervene should therefore be granted and the subpoena should be quashed.

Respectfully submitted,

Arthur B. Spitzer (D.C. Bar No. 235960)
Elizabeth Zane
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
Tel. 202-457-0800
Fax 202-452-1868
art@aclu-nca.org

Steven Salky (D.C. Bar. No. 360175)
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel. 202-778-1828
Fax 202-822-8106
ssalky@zuckerman.

June 23, 2011

I hereby certify that I served a copy of the foregoing motion to Intervene and to Quash on Ronald Machen Jr., United States Attorney for the District of Columbia, by first-class mail this 23rd day of June, 2011.

Arthur B. Spitzer.

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
for the

District of Columbia

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Automatic
Attn: Custodian of Records
60 29th Street, #343
San Francisco, CA 94110-4929

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown
below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court
officer allows you to leave.

| Place: U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA | Date and Time: |
|---|---|
| U.S. Courthouse, 3rd Floor   Grand Jury # 09-3<br>333 Constitution Avenue, N.W.<br>Washington, D.C. 20001 | Friday, April 8, 2011 @ 9:00 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

SEE ATTACHED

In lieu of personally appearing before the Grand Jury on the date indicated, you may comply with this subpoena by promptly
providing the requested documents by fax to United States Capitol Police Special Agent Meghan Blasi at 202-224-0919.  Any
questions about this subpoena may be directed to Special Agent Blasi at 202-406-8600, or the undersigned Assistant United States
Attorney.

Date: <u>March 24, 2011</u>

*ANGELA D. CAESAR, CLERK OF COURT*

*Signature of Clerk or Deputy Clerk.*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who
requests this subpoena, are:

T. PATRICK MARTIN, Assistant U.S. Attorney
United States Attorney's Office
555 4th Street, NW  Room # 11-439
Washington, DC 20530      Phone#: (202) 252-7398
Email:Thomas.Martin@usdoj.gov   Fax#: (202) 252-7792

Subpoena # 10218019
USAO # 2010R02028
In re: PVO of 18 U.S.C. § 115
Preparer:  CB

EXHIBIT A

**ATTACHMENT**
**to Grand Jury Subpoena**

Subpoena for: **Automatic**                     Subpoena # 10218019 / Prepared by: CB

March 24, 2011

Please provide any records relating to the identity of the person(s) that made a posting on
http://hlet.wordpress.com/ who identified themselves as "Hanibal Lecter's Evil Twin" on 12/2/2010 at 3:23,
time zone PST

## EXHIBIT B

## The Senatorial Blog Posts of December 2, 2010

### Lisa Murkowski – Republicunt from Alaska
December 2, 2010

I already awarded the citizens of Alaska who wrote in Murkowski's name my November 2010 Cunt of the Month.

Murkowski has already confirmed the perspicacity of my award by voting against the earmark ban.

She can't be gotten rid of for 6 years, short of a tragic but welcome botox accident. Anyone else notice how much she looks and acts like the mom on Arrested Development?

Shame on Alaska. You have 6 years to do penance and redeem yourselves. Maybe a recall election could get you out of purgatory faster.

=================================================

### Thad Cochran – Republican Senator from Mississippi
December 2, 2010

Thad Cockroach isn't up for rejection till 2014. He's old as hell. If we're lucky, he'll die before then from all the pork he's been consuming.

Citizens Against Government Waste rates him the top porker in the Senate this year. Yep, he beat out all Democrats.

He voted against the earmark ban, shocker.

He's a slimy political animal. Let's put him down.

=================================================

### Jim Inhofe – Public Enemy #1 from Oklahoma
December 2, 2010

Inhofe is up for rejection in 2012. Right now, there's nobody I can think of that it's more important to beat. Including President Toonces.

In the long run, it's more important to make Republicans fear us than to beat Democrats.

Unless, of course, the Republican establishment fucks us now, in which case we'll destroy the Republican Party.

Inhofe led the rhetorical charge for pork. We need to Old Yeller him.

=================================================

### George Voinovich – Lame Fuck from Ohio
December 2, 2010

Like that piece of shit Bob Bennett, this pinhead voted against the earmark ban. I expect Bennett is on his way to the dustbin of history, albeit with a cushy bullshit job, but Voinovich is likely to stay engaged in serious corruption.

C'mon Ohio–keep a sharp eye on this Republican turdblossom.

=================================================

### Richard Lugar – Republican Senator from Indiana
December 2, 2010

Dick just voted against the earmark ban. He's up for election in 2012. I'll give money to a Democrat to defeat him. And so should you. If it comes to that.

We don't need this establishment backstabbing bastard. It's much more important to hang traitors on our side than to beat the other side.

=================================================

### Richard Shelby – Neo-Republican Senator from Alabama
December 2, 2010

This nasty little ratfucker used to be a Democrat. In 1994, the day after Republicans took over the Senate–and he wasn't up for re-election that year–he switched parties.

He's a fascist on gun control, siding with Barbara Boxer on the asinine trigger lock bill and with Joe Biden's anti-semi-auto ban. H also was in the anti-Bork lynch mob.

I really don't want to hear from conservative pussies about how many good things he's in favor of.

We're in zero tolerance territory here. There's no excuse, no quarter, for those voting against the earmark ban.

Damn right it's a litmus test. These assholes need to get the message. We'll shoot our own dog if it snarls at us once.

Unfortunately, this Dick is safe till 2016. But if he thinks we'll forget by then, he's wrong.

========================================================

### Bob Bennett – Lame Fuck from Utah
December 2, 2010
Bob Bennett, a poster child for the kind of Republican establishment douchebags we're all sick of, got torched by Mike Lee this year. Put a fork in Bennett, because he needs to have forks stuck into him.

Still, on his way out the door, this prick voted against the Senate earmark ban. Why? Or, a better question, can you imagine any reason why that doesn't make you hate him even more?

If this Mr. Burns-looking putz tries to rise from the dead, let's not forget his parting shot.

My guess is he's going to land a cushy Utah government job or rub his greasy ass up against some big lobbying firm, and this was his boner fides.

###